### UNITED STATES v. SPRAGUE et al.

District Court, D. New Jersey.
Dec. 16, 1930.

Phillip Forman, U. S. Atty., of Trenton, N. J.

Frederic M. P. Pearse, of Newark, N. J. (Selden Bacon, Daniel F. Cohalan, and Julius Henry Cohen, all of New York City, of counsel), for Defendants.

CLARK, District Judge.

The traditional method of adopting amendments to the United States Constitution is challenged. Upon the outcome of that challenge depends the disposition of the case at bar. Even if this opinion meets with a cold reception in the appellate courts, we hope that it will at least have the effect of focusing the country's thought upon the neglected method of considering constitutional amendments in conventions. We have often wished for some statute kin to that of mortmain to remove the dead hand of tradition from the domain of ideas. As is familiar, all amendments so far made part of our constitutional structure have been proposed by Congress for ratification "by the Legislatures of three-fourths of the several States." This accustomed procedure has left unnoticed in article 5 of the Constitution the companion provision for ratification, "or by Conventions in three fourths thereof." This language is now being lifted from its obscurity by the claim that a lack of compliance therewith has invalidated the ratification of the Eighteenth Amendment, upon which the present indictment depends.

At the outset, the court wishes to disavow, for itself at least, any credit or discredit, as the case may be, for the change in emphasis to be accorded the phrasing of article 5. It cannot speak for counsel, as the following quotations are not to be found in their brief. The human mind is stimulated to inventive thought by particular needs; hence Poor Richard's homely proverb. It is not surprising, then, to find the contention of the counsel in the case at bar first appearing in the congressional debates on the proposal of the amendments ensuing upon the conclusion of the war between the States. So exactly has Senator Dixon, of Connecticut, anticipated the gist of our present argument in his discussion of the Fourteenth Amendment that we quote from his speech as reported in the Congressional Globe for January 29, 1869 (3d Session, 40th Cong., p. 706), at some length:

"It has been said that the proposition is to deprive the people of the respective States of this power of controlling the right of suffrage within their own limits by their own consent, and that therefore their rights are not interfered with. How by their consent? Technically or in fact? I admit that technically this question is proposed to be submitted to the people of this country, but is it in point of fact? Is there any real submission? * * * Would it be fair to submit a question of this character to the present Legislature of the State of Ohio? You would not think so if every Legislature had the same sentiments and had been elected a year and a half ago, and was still in exist-

ence. I ask any Senator whether it could be said that a Legislature with those sentiments thus elected upon other issues was a fair tribunal to express the sentiments of the people of that State upon a question of this character? * * * It may even be said that the Legislature of the State of Ohio was chosen with more reference to this question than the Legislatures of other States, because when that Legislature was chosen the question was pending before the people of the State, and the people actually voted down the proposition by a majority of nearly fifty thousand votes. But notwithstanding that fact, which shows that the subject was under consideration, I still say that I cannot as a Senator declare that I believe it would be fair to submit a proposition of this character to the Legislatures of all the States having the same views as the Legislature of Ohio, chosen a year and a half ago. That, sir, is what you propose to do, because it happens that the Legislatures are in favor of your proposition. Would you do it if they were against it?

"A word further as to the question whether this is a submission to the people. When the Constitution was formed provision was made that amendments to it might be submitted to the Legislatures or to conventions in the various States. Of course the intention was that Congress should select and judge as between these forms of submission; but can any man suppose that at that period in the history of our country it was ever supposed that questions of amendments to the Constitution would come to be party questions, submitted with party views, and to a party majority? I do not reproach anybody that that should now be the fact. It is, perhaps, a necessity of the case, and cannot well be otherwise; but when the Constitution was formed there was probably no anticipation of such a state of things, and therefore when it was proposed to submit questions of amendment to Legislatures or conventions the meaning and intent was that the *people* should have an opportunity to act, that they should at least have an opportunity to elect those Legislatures or those conventions with reference to the consideration of the proposed amendments.

"But suppose you now say that this question shall be considered by the Legislatures of the States, and not by conventions. Then, from the very necessity of the case, you must place it before bodies actually chosen by the people before the question was presented. It is impossible, in my judgment, for Congress by any particular phraseology of their submission of the proposition, to prevent an existing Legislature from acting on a question submitted. The legislature of Ohio chosen two years ago, if this subject is submitted before they go out of existence, have a right to act on it. The Legislature of Connecticut now existing, if the proposition were submitted in season, might be called together by the Governor and act upon it. You cannot prevent it. Therefore it seems to me that it is absolutely essential, in order to get the action of the people on this question, that it should be submitted to bodies to be elected by themselves subsequently, to wit, conventions, because you cannot control the question of submission to the Legislatures."

We find another echo of it in one of President Johnson's messages of those years:

"Nor have the sovereign people of the nation been afforded an opportunity of expressing their views upon the important questions which the amendment involves. Grave doubts, therefore, may naturally and justly arise as to whether the action of Congress is in harmony with the sentiments of the people, and whether State legislatures, elected without reference to such an issue, should be called upon by Congress to decide respecting the ratification of the proposed amendment." Message of June 22, 1866. Richardson, Messages and Papers of the Presidents (1789–1897), vol. VI, p. 391.

Coming, now, to our own times and the Eighteenth Amendment, an examination of a series of articles appearing in various legal periodicals in the year 1920 discloses a parallel line of reasoning. We quote from two:

"And it will also be conceded that even though the state legislatures of fifty years ago had no right, power, or authority, under Article V, to adopt such amendments as these so-called War Amendments—such power not having been delegated to those legislatures by the people, in adopting Article V—nevertheless, if after these so-called War Amendments were thus adopted the people had assembled in convention, either in one national convention or in separate conventions held in each state, and ratified that action of the state legislatures, the validity of these amendments would have been put beyond question." Marbury, The Limitations Upon the Amending Power, 33 Harv. Law Rev. 232.

"* * * Third, that such consent (i. e. to the 18th Amendment) cannot be given by the legislatures of the States, but must come from conventions duly convened in accord-

ance with a specific vote of a majority of the enfranchised citizens of the States respectively." White, Is There an Eighteenth Amendment? 5 Cornell Law Quarterly, 89; reprinted 54 Am. Law Rev. 245, at page 261.

"Such of the sovereign powers as were originally surrendered by the States to the United States were, therefore, so surrendered, not by the States as sovereignties acting through their legislatures, but by the People of the several States acting in the only way in which they can act, by conventions. If, in order to delegate to the United States, those powers which were delegated by the Constitution, it was necessary that the people as such should act in the matter and they did so act, equally is it necessary, in order to surrender other powers 'not delegated to the United States by the Constitution,' but 'reserved to the States respectively or to the People,' that the people should act in the same formal and specific manner." Ibid. And so the Honorable Louis A. Coolidge, of Milton, Mass., in a letter to the Committee of the Judiciary of the House of Representatives with respect to the Wadsworth-Garret Amendment then being considered by that Committee, says on page 6: "It is a grave question in the minds of some eminent legal authorities whether any existing amendment, surrendering the rights of citizens, is validly a part of the Constitution if ratified by Legislatures solely and not by conventions of the people.

See also Intrinsic Limitations on the Power of Constitutional Amendment, by Skinner, 18 Mich. Law Rev. 213; Inalienable Rights and the Eighteenth Amendment, by Abbott, 20 Col. Law Rev. 185; Is the Eighteenth Amendment Void Because of its Contents? by McGovney, 20 Col. Law Rev. 499.

It must be confessed that the learned authors of these brochures propound our present theory rather by way of incidental suggestion than with any desire to follow it to its ultimate conclusions. In fact, they become enmeshed in a consideration of the constitutionality of the substance of the amendment.

We also are concerned with the substance or subject-matter of the Eighteenth Amendment, but our interest is not intrinsic and per se. It lies only in the relation between that substance or subject-matter and the manner of its adoption. This destinction is important perhaps from this point of view of the justiciable character of the question and certainly with reference to the doctrine of stare de-

cisis. It is clear that a court's investigation as to whether the procedure prescribed for adoption of an amendment has been legally followed is one thing, and a similar investigation into the legality of the government of which the court is a branch is quite another. Consideration of amendments from the angle of their permissibility under an existing constitutional system must lead to the court's being the final arbiter of the form of government under which they function. Until the so-called National Prohibition Cases (Rhode Island v. Palmer, Feigenspan v. Bodine, etc., 253 U. S. 350, 40 S. Ct. 588, 64 L. Ed. 946 [1920]), there had been only one case in the United States Supreme Court (Hollingsworth v. Virginia [1798] 3 Dall. 378, 1 L. Ed. 644) wherein an amendment to the Constitution (the Eleventh) had been drawn in question. There, as here, only the procedure (failure of the President to sign the resolution) was objected to. In 1849 the events arising out of Dorr's rebellion in Rhode Island (for an interesting account of this "most remarkable struggle for Constitutional Government in our history," see McMaster, History of the United States, vol. 7, p. 165 et sequitur), brought before the Supreme Court of the United States in the case of Luther v. Borden (1849) 7 How. 1, 12 L. Ed. 581, rights dependent upon the validity of various Constitutions of that state. Chief Justice Taney in a dictum (the merits of the case turned on the right of the President to call out the militia) declared the question to be a political one. One might pause to observe that Taney's propensity for dicta finally ended in the tragedy of the Dred Scott Case. This dictum was widely followed in the state courts. These decisions are collected in an article in 11 Minn. Law Rev. p. 369, entitled, "Federal Amending Power, Genesis and Justiceability."

An excellent illustration of the distinction we are seeking to make is to be found in two cases arising in New Jersey. In the first of these, Bott v. Secretary of State, 63 N. J. Law, 289, 43 A. 744, 881, 45 L. R. A. 251, the phrase "majority of voters" in the amending clause was construed and the lottery amendment found to have been approved in accordance therewith. In Carpenter v. Cornish, 83 N. J. Law, 254, 83 A. 31, on the other hand, the Constitution of 1844 of this state was attacked on the ground that women had not been permitted to vote for the delegates whose deliberations had resulted in its submission to the male voters. Mr. Justice Swayze, speaking for the Court of Appeals,

970

pointed out that the courts do not undertake to determine so fundamenal a political question as the existence of the government they serve.

No Constitution, federal or otherwise, was attacked in the federal courts from the time of the dictum of Luther v. Borden until the argument of the National Prohibition Cases. There those arguing for validity contended that the issues were not judicially cognizable. We agree with Professor Dodd that the statements in the briefs regarding this point are not always clear and confuse adoption and substance. Amending the Constitution, W. F. Dodd, 30 Yale Law Jour. 321. However, the ultimate decision of the case, instead of its dismissal for want of jurisdiction, would seem to establish the doctrine that the substance of an amendment, and therefore, of course, of an entirely new Constitution, might have to conform to the particular theories of political science, sociology, economics, etc., held by the current judicial branch of the Government.

This court has never been especially impressed with the theory, stare decisis et non quieta movere. It is too often invoked as an agreeable substitute for mental effort. A Chief Justice of Georgia once remarked that courts of last resort lived by correcting the errors of others and adhering to their own. The leading writer on the question has laid down what seems to us the sensible rule. Chamberlain, Stare Decisis, at page 19:

"The degree of authority belonging to such a precedent depends, of necessity, on its agreement with the spirit of the times or the judgment of subsequent tribunals upon its correctness as a statement of the existing or actual law, and the compulsion or exigency of the doctrine is, in the last analysis, moral and intellectual, rather than arbitrary or inflexible."

Moreover, Chief Justice Moschzisker, of Pennsylvania, in an article published in 1924 points out that the rule should not be applied with "undue severity" in constitutional cases. Stare Decisis in Courts of Last Resort, 37 Harv. Law Rev. 409, 420. The Supreme Court of the United States has taken much the same position. Famous examples are the different views expressed on the citizenship of a corporation under the diversity clause (Bank of U. S. v. Devereaux, 5 Cranch, 61, 3 L. Ed. 38 [1809] Louisville Ry. Co. v. Letson [1844] 2 How. 497, 11 L. Ed. 353); on the Great Lakes as navigable waters under the commerce clause (The Thomas Jefferson [1825], 10 Wheat. 428, 6 L. Ed. 358, and The

Genesee Chief v. Fitzhugh [1851] 12 How. 443, 451, 13 L. Ed. 1058); the legal tender (Hepburn v. Griswold [1869] 8 Wall. 603, 19 L. Ed. 513, and Legal Tender Cases [1870] 12 Wall. 457, 20 L. Ed. 287); and income tax cases (Hylton v. United States [1796] 3 Dall. 171, 1 L. Ed. 556, and Pollock v. Farmers' Loan & Trust Co. [1895] 158 U. S. 601, 15 S. Ct. 912, 39 L. Ed. 1108) under the borrowing and taxing powers; and, finally, the reasonableness of hours of labor legislation under the due process clause (Lochner v. New York (1904) 198 U. S. 64, 25 S. Ct. 539, 49 L. Ed. 937, 3 Am. Cas. 1133, and Bunting v. Oregon (1917) 243 U. S. 426, 37 S. Ct. 435, 61 L. Ed. 830, Ann. Cas. 1918A, 1043). Justice Brandeis, with his usual industry and ability, has made a collection of additional instances of such changes in his opinion in State of Washington v. W. C. Dawson & Co. (1924) 264 U. S. 219, 44 S. Ct. 302, 68 L. Ed. 646. A careful examination of the arguments (both oral and written) of counsel in the National Prohibition Cases in the light of the findings of the court (for in such unusual form were the cases decided) makes it plain that no such course will be imposed upon them in the decision of the case at bar. For convenience, the findings of the National Prohibition Cases essential to the present discussion are set forth below:

"4. The prohibition of the manufacture, sale, transportation, importation and exportation of intoxicating liquors for beverage purposes, as embodied in the Eighteenth Amendment, is within the power to amend reserved by Article V of the Constitution.

"5. That Amendment, by lawful proposal and ratification, has become a part of the Constitution, and must be respected and given effect the same as other provisions of that instrument."

Findings 4 and 5, 253 U. S. 350, 386, 40 S. Ct. 588, 64 L. Ed. 946.

Counsel attacked the substance or subject-matter of the Eighteenth Amendment on three grounds: The first, viz., that the word "Amendment" as used in article 5 did not include "alteration"; second that the amendment was in effect legislation; and third, and principally, Messrs. Root, Bullitt, and Mayer argued that either because of the Tenth Amendment or because of the nature of the federal system, or because of both, constitutional amendments changing the distribution of powers as between the states and United States, and by so doing reducing the state's police power, are forbidden.

Manifestly, they proceed on assumptions entirely foreign to the present controversy. We cannot stop to discuss the merits of these final arguments. The first two are fully discussed and effectively answered both in the present Chief Justice's brief in the National Prohibition Cases (Volume 108, New York Bar Ass'n U. S. Supreme Court Briefs) and in Professor Dodd's article, "Amending the Constitution," above quoted. As to the third contention of Messrs. Root et al., we perhaps need only quote from those two distinguished lawyers, Professors McBain and F. J. Stimson:

"Let it be conceded that the good people of 1789 would have been horrified at any such invasion of state powers, although, incidentally, they would probably have regarded state prohibition as almost equally horrendous. Even so, how could it be rationally argued that by the ninth and tenth amendments they intended to make the division of powers between the nation and the states static throughout eternity—so static indeed that it could not be changed even by the difficult process of amending the constitution?" McBain, Prohibition: Legal and Illegal, p. 61.

"Such an event to their labors would make the framers turn in their graves. Never for one moment did the idea occur to them that the 5th Article of the Constitution providing for its future amendment might open the door to the destruction of all its principles by changes sacrificing those elemental rights which they all believed no government might take away and which they had fought the Revolution to secure; by amendments qualitative or what I have termed substantive in nature, controlling or overriding those very rights which it was framed to protect, and losing sight of their own vision that this Constitution was being made to protect the people from their government even as to these essential human liberties, never to further bind them albeit it had a majority behind it.

"Yet the Constitution cannot rise above the Constitution and it is by its own terms subject to amendment, save the provisions protecting slave importation and forbidding direct Federal taxation before 1808 and always the equal representation of States in the Senate."

Stimson, The American Constitution as it Protects Private Rights, p. 216.

It is to be noticed that finding 5 of the National Prohibition Cases, above cited, included the word "ratification." In the two cases of Hawke v. Smith (1920) 253 U. S. 221, 40 S. Ct. 495, 64 L. Ed. 871, 10 A. L. R. 1504, and Leser v. Garnett (1922) 258 U. S. 130, 42 S. Ct. 217, 66 L. Ed. 505, the United States Supreme Court passed upon the question of ratification of the Eighteenth and Nineteenth Amendments, respectively. An analysis of the briefs in the National Prohibition Cases and of the facts in the two last-named cases demonstrated that the only question at issue therein was the meaning of the word "Legislature" as used in article 5. One side contended that it meant a depository of legislative power, i e., the people; and the other, that it was used in what might be termed its trade meaning, i. e., a representative lawmaking body. The Supreme Court in both cases agreed with the latter view and held the referendum provisions of a state inappropriate to the ratification of a constitutional amendment. These decisions (in one of which he later participated as Chief Justice) of the highest court had been foreshadowed in an article by the late Chief Justice Taft in an article entitled, "Can Ratification of an Amendment to the Constitution be Made to Depend on a Referendum?" wherein the previous conflicting state authorities are reviewed and discussed. Neither by holding nor by extraneous discussion did these cases assume to deal with the ratification of amendments by conventions—the second of the three conceivable methods. The late Chief Justice emphasizes this is the form of his argument in favor of the construction ultimately adopted by the Supreme Court:

"That it was the intention to submit the ratification to the popular representative bodies named, and not to their constituencies, is clearly shown by the alternative for the state legislatures which under the Article Congress may in its discretion substitute as the ratifying agencies. These are conventions in the state called for the purpose. These are the same kind of representative bodies which adopted the Constitution and exclude necessarily any idea of further submission to the people directly of the proposed amendment.

"This, too, disposes of the argument adopted by the Washington and Ohio courts, that the word 'Legislatures' means the lawmaking power of the states, for certainly a convention called for the purpose of ratifying an amendment is not part of the lawmaking power of the state. * * *

"If proposal or ratification were mere law making, then under section 7, Article I, action of the two Houses of Congress must be submitted to the President for his approval

or disapproval. Yet in Hollingsworth v. Virginia it was held that a proposal by two-thirds of both Houses was sufficient under the article without submitting it to the President for his approval or disapproval, and this view has been confirmed by the practice since and by express resolutions of the Senate."

29 Yale Law Journal, 824.

As a matter of fact, though neither counsel has seen fit to furnish the court with a reference thereto, the utterance of the Supreme Court most damaging to the theory that ratification of the Eighteenth Amendment 'by Conventions is necessary for its validity is to be found in the case of Dillon v. Gloss (1921) 256 U. S. 368, at page 374, 41 S. Ct. 510, 512, 65 L. Ed. 994, wherein the court says:

"Thus the people of the United States, by whom the Constitution was ordained and established, have made it a condition to amending that instrument that the amendment be submitted to representative assemblies in the several states and be ratified in three-fourths of them. The plain meaning of this is (a) that all amendments must have the sanction of the people of the United States, the original fountain of power, acting through representative assemblies, and (b) that ratification by these assemblies in three-fourths of the states shall be taken as a decisive expression of the people's will and be binding on all."

It must be noted, however, that the learned justice was only passing upon the power of Congress in proposing an amendment to the Federal Constitution to fix a definite period for ratification by the states. This question is also discussed in Professor Dodd's article above cited, at page 340, and in an article published in 14 Va. Law Rev. entitled "Can a State Prescribe a Breathing Spell before its Legislature Acts upon a Proposed Amendment to the Federal Constitution?" at page 191, where it is pointed out that the seven-year provision did not harm the petitioner. The remarks of the court would seem, therefore, to be dictum.

Limitations of both space and capacity prescribe our entering upon any extended discussion of the theories underlying a Federal system. Certain considerations lead, however, so directly to the subject of Constitutional amendment that they should be mentioned. If states (used in the political rather than the geographical sense) decide to integrate (this term by definition excludes alliances or personal unions), they may do

so by mutual absorption or else by a federation. If they choose the former course, they become a unitary state; if the latter, a federation. Garner, Political Science and Government, p. 273; Strong, Modern Political Constitutions, p. 79; Burgess, Political Science and Constitutional Law, vol. 1, p. 81. By definition again, the component members of a federal state are not mere administrative circumscriptions, but subsidiary sovereignties retaining a wide legislative power. Garner, p. 274, and Strong, p. 62, above cited. Professor Dicey says a federal state is a political contrivance intended to reconcile national unity and power with the maintenance of "state rights." Such reconcilement requires, of course, a distribution of powers between the central or federal organization and the component units, and equally of course requires some authority which shall determine this distribution. Not only must this authority be a Constitution, but a particular type of Constitution.

Since a Federal Constitution partakes of the character of a treaty, "neither the ordinary legislatures of the individual states nor the legislature of the union can have the power to alter the constitution without some special means being adopted for discovering the views of the constituent members." Strong, p. 61. Fortunately, the constitutional growth in the Colonies furnished ample precedent for the required type prior to 1787. The Mayflower Compact, John Robinson Scruby Congregation at Plymouth, and the Fundamental Orders of Connecticut of 1639 are familiar examples of early colonial agreements for government. See, Thorpe, Charters, Constitutions and Organic Laws, p. 519; David, John Robinson (1903), p. 48. Likewise, the "Agreement of the People," granted by the Council of the Army in 1647, was in fact a draft constitution for the commonwealth under Cromwell. Dunning, Political Theories, p. 238. These documents and some of the later and more complete frames of government did not contemplate any change and therefore provided no method for their own amendment; so the Constitutions of South Carolina (Thorpe, p. 3241), Virginia (Thorpe, p. 2812), New Jersey (Thorpe, p. 2594), New Hampshire (Thorpe, p. 2451), New York (Thorpe, p. 2623), and North Carolina (Thorpe, p. 3350). Hoar, Constitutional Conventions, p. 8. They were, of course, "rigid," as that term is used by Viscount Bryce. Even when the necessity for providing for alteration became apparent and amending clauses were

included, this element of rigidity was preserved. The Constitutions were not permitted to become flexible. As Bryce defines the difference, the amending powers in the former type of Constitution must be exercised in a manner separate and distinct from that prescribed for ordinary legislation. Bryce, Studies in History and Jurisprudence, p. 50 et seq. Hoar has summarized the Constitutions of the American states prior to 1787 as follows:

"Six of the early constitutions, and the rejected Massachusetts constitution of 1778, provided no method for their own amendment. (See above.) "Of the eight constitutions which did provide for amendment, three provided for legislative action (in a manner different and more difficult, however, than the passage of a mere statute), (viz. Maryland, Thorpe p. 1686, Delaware, p. 262, and South Carolina (1778), p. 3248); two provided for submission by a council of censors for ratification by a specially called convention (Pennsylvania, p. 3079, and Vermont, p. 3737); one provided for a convention called by petition (Georgia, p. 7770); and one for a convention called by a popular vote at a certain fixed date (Massachusetts, p. 1888)." Constitutional Conventions, p. 8.

The provision of the Pennslyvania Constitution of 1776 (incidentally, the Pennsylvania frame of government of 1683, William Penn's Charter Privileges of 1701 [Thorpe p. 3081], was the first American governmental framework which embodied the principle of rigidity, it requiring the consent of the governor for the time being in six parts of seven of the Assembly for an amendment) is sufficiently suggestive, in our opinion, of article 5 of the Federal Constitution to justify its inclusion:

"The said council of censors shall have also power to call a convention to meet within two years after their sitting, if there appear to them an absolute necessity for amending any article of the constitution which may be defective, explaining such as may be thought not clearly expressed, and of adding such as are necessary for the preservation of the rights and happiness of the people; but such articles as are proposed to be amended shall be promulgated six months before the day appointed for the election of such convention, for the previous consideration of the people that they, may have an opportunity of instructing their delegates on the subject." Thorpe, p. 3092.

The thirteenth and fifteenth of Randolph's original resolutions, submitted on May 29 to the Constitutional Convention of 1787, read as follows:

"13. 'Resolved, that provision ought to be made for the amendment of the Articles of Union, whensoever it shall seem necessary; and that the assent of the National Legislature ought not to be required thereto."

"15. 'Resolved, that the amendments which shall be offered to the Confederation, by the Convention, ought, at a proper time or times, after the approbation of Congress, to be submitted to an assembly or assemblies of representatives, recommended by the several Legislatures, to be expressly chosen by the people to consider and decide thereon.'"

Scott, Madison's Journal, p. 63.

On June 5 and June 11 there was some discussion in the Committee of the Whole as to the necessity of such a provision. Journal, p. 110, 149. The committee, and finally the convention, on July 23 accepted the resolution, with the exception of the clause requiring the assent of the national Legislature. Page 409. The Committee of Detail, in a Constitution reported on August 6, for the first time made provision as to the manner in which amendments should be proposed, in article 19, which read:

"On the application of the Legislatures of two thirds of the States in the Union, for an amendment of this Constitution, the Legislature of the United States shall call a Convention for that purpose." Journal, p. 641.

This proposed article was debated on September 10. Journal, p. 692. On that day, Hamilton suggested that the national Legislature, as it will be the first to perceive the most sensible of amendments, ought also to be empowered, with the concurrence of each Branch, to call a convention. Madison thought the article vague. It did not, in fact, make clear whether the Legislatures were to propose the amendments and the convention was to adopt them, or whether the conventions were to both propose and adopt them, or only propose them for adoption by some other body or bodies not specified. Gerry objected that two-thirds of the states may obtain a convention, a majority of which can bind the Union to innovations that may subvert the state constitution altogether. He and Sherman, accordingly, moved to add to the article the words, "or the Legislature may propose amendments to the several States for their approbation, but no amendments shall be binding until consented to by the several States." Journal, p.

693. This was finally agreed to, with the inclusion of the numerical qualification "three fourths of" before "the States," submitted by Wilson. Journal, p. 693. Madison then proposed a substitute, which, with the convention method of proposing amendments suggested by Morris, finally became article 5 of the Constitution, which reads as follows:

"The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate." Warren, The Making of the Constitution, p. 674.

The significance, for our purposes, of these proceedings lies: First, in their exclusion of the national Legislature from the original resolution of Randolph and from the initiation of the call for a convention in article 19 of the Committee of Detail's report; second, in the insistence upon the approbation of the several states; and, third, in the use of a convention both in article 19, above cited, in Hamilton's substitute, and in Morris' amendment thereto.

The stereotyped method of constitutional interpretation and/or construction is summed up by Mr. Justice Holmes in a very recent opinion, Ohio v. Agler (1930) 280 U. S. 379, page 383, 50 S. Ct. 154, 155, 74 L. Ed. 489, wherein he said: "The language so far as it affects the present case is pretty sweeping, but like all language it has to be interpreted in the light of the tacit assumptions upon which it is reasonable to suppose that the language was used." And he went on to decide that "all," the acme of inclusion, did not include divorce cases affecting Consuls, within the meaning of the third article. Counsel have accordingly laid before us an elaborate and brilliant argument based, first, on a "tired eyed" scrutiny of the Constitution as a document, and, second, on a study of its historical and political background.

Any express limitation of the language of article 5 must be sought in some reservation. The only defeasance in the grant of the Constitution is found in the Tenth Amendment. Counsel have placed the two provisions in combination and have argued that the result justifies their thesis that any amendment granting governmental powers over the people to the United States must be submitted to conventions, instead of to state Legislatures.

The historical background of the first ten amendments to the Constitution is too well known to require detailed repetition here. Barron v. Baltimore (1833). 7 Pet. 243, at page 250, 8 L. Ed. 672. The state Constitutions enacted prior to 1787 included various provisions borrowed from the English Bill of Rights (1689). Macaulay, History of England, vol. 3, p. 400. In the ratifying conventions in the larger states much was made by the opponents of the Constitution of the omission to include similar provisions therein. The Federalists finally secured a favorable vote by the promise that the first Congress would remedy these defects. Included with the amendments guarding against personal oppression were two, the Ninth and Tenth, prompted by the desire to safeguard the smaller governmental units from oppression by the larger. The Tenth Amendment reads as follows:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

It is interesting to students of constitutional law to observe that the identical language appears as section 107 of the Australian Constitution, and that problems similar in scope to our own have been recently agitating the courts of Australia and the Privy Council in England. Constitutional Relations, W. A. Hallman, Law Quarterly, No. 46, p. 184; Attorney-General v. Colonial Sugar Co. [1914] A. C. page 237. In Canada, on the other hand, what Viscount Bryce calls "the unallotted residue of powers" remains with the federal government, rather than with the various provinces. See Political and Provincial Taxation in Canada, chapter on the Growth of the Canadian Constitution, 28 Columbia University Studies.

We have seen that the circumstance which gives a Constitution rigidity, within the definition of Viscount Bryce, lies in its amendment in a manner different from that followed in the enactment of legislation. Such difference may be evinced in several ways: The change may be formulated by an abandonment of the majority principle in favor of some greater proportion. This was the case

in the early charter granted by William Penn to his colonists and in the Constitutions of the two Carolinas and Georgia. The purpose of these differences being in the direction of greater difficulty and therefore greater deliberation, it is not surprising to find a requirement that in addition to formulation there also be approval or ratification. This second step in the process could be and sometimes was assigned to the same governmental body that had been engaged in the original formulation. On the other hand, it might be assigned to one of the other elements that go to make up the body politic, most often, of course, to the people who originally submitted themselves to the particular frame of government it is sought to change. Because a federal government is only one step beyond an alliance, and because, therefore, its fundamental instrument partakes of the character of a treaty, although possible, it would be curious if the power of approval of changes therein was not accorded in some way to the original and component units. The submission for approval of an already formulated amendment requires as a condition precedent a proposal. Thus, we have three steps—formulation, proposal, and approval. This is the procedure prescribed in the amending clauses of the early Constitutions of Vermont, New Hampshire, Massachusetts, and Pennsylvania, and of the United States.

We do not need the somewhat elaborate argument based upon the addition of the words "United States" to the Tenth Amendment by Roger Sherman, of Connecticut (1 Annals of Congress, 768) to aid us in holding that the power to amend is not delegated to the United States. In terms, the power of proposal alone is assigned to Congress, and therefore so delegated. The power of formulating amendments (the word "propose" seems somewhat ineptly used in the first part of article 5) is assigned to two-thirds of both Houses of Congress or to a convention called on application of the Legislatures of two-thirds of the several states. The power of approval is, on the other hand, lodged in the Legislatures of or conventions in three-fourths of the several states. If, then, the power to amend is included within the reserved powers, the Tenth Amendment applies, and the reservation must be to the states respectively, or to the people. Such a reservation is manifestly a nullity, if Congress is to have absolute and unlimited discretion in its exercise of the proposing power, as it can and always has placed the amendments before the Legislatures and ex-

cluded the conventions. A division or limitation upon its discretion is therefore required. Counsel have made this division and limitation according to the "source," as they say, of the power granted by the amendment, and argue that a change granting governmental powers over the people must be ratified by Conventions of the people.

In our judgment, this joint construction of article 5 and the Tenth Amendment is too strained to be permissible. It involves, we think, a misconception of the meaning of the terms "people" and "power." We quite agree with Professor Dunning that:

"On one fundamental question the formal pronouncements of the Americans were hardly more coherent and logical than the multitude of democratic theories that had preceded them. They furnished no precise conception of 'the people' or 'a people.' The term was used indiscriminately in the collective and in the distributive sense. No criterion was afforded by which the possessor of sovereignty or of rights could be identified." History of Political Theories, From Rousseau to Spencer, p. 97.

We cannot, however, follow the argument that a convention is more within the definition of people than a state Legislature. There may be several stages in the politico-scientific conception of the people in relation to their government. It may mean, for instance, the mass of human beings in a geographical area, the electors, their agents for a special purpose, or their agents for general purposes. The nonfreeholding males of Rhode Island and the women of New Jersey earnestly, though unsuccessfully, contended that they were "people" in the constitutional controversies referred to earlier in this opinion. At any rate, both the convention, the special agent, and the Legislature, the general agent, are clearly but different manifestations of the machinery of representation required by the inconvenience of direct action (an inconvenience greatly removed latterly by improvements in printing, postal service, and education; hence, the referendum). We have never before heard it contended that either one or the other is "the People." It would be most extraordinary, therefore, to argue that one should and the other should not be so classified. So Senator Hoar, in Constitutional Conventions, said:

"But in America the representative convention developed. It was a step as far beyond Runnymede as our constitutions were beyond Magna Charta." Page 2.

And Congressman Luce, speaking of the ratification of the federal Constitution:

"Had the decision been taken in the town-meetings and at the county courts, it is altogether probable that the new Constitution would not have been adopted. Luckily the final word rested not with the people but with their representatives, gathered in State Conventions." Legislative Principles, p. 630.

In Judge Jameson's discussion of the various species of conventions, he lists the General Assembly under the term "legislative Convention." Jameson, Constitutional Conventions, p. 5. The Tenth Amendment does not read "the people in Convention assembled" any more than it reads "the people by their legislative representatives," and we see no warrant for placing the one or the other abstract interpretation on the single noun.

In the second place, counsel seem to be talking about power (legal competence), when what they really mean is the application of power. In other words, they interpret the Tenth Amendment to read, "powers, whose application is to the people, are reserved to the people," rather than to the states. This we think to be historically untrue. One might imagine powers not delegated to a particular state government at the time of the adoption of the Constitution; to give extreme examples, power to establish a state religion or to nationalize women. Such a power would be reserved to the people of that State. Our own view is that if the phrase "or to the people," added without explanation by Carroll, of Maryland (1 Annals of Congress, p. 761), had any meaning at all, which many political theorists doubt (Merriam, American Political Theories, p. 257), it has reference to such a case. We are aware that this theory would be disputed by those thinkers and jurists who consider the phrase signifies some power reserved to the people nationally. · Turner v. Williams (1904), 194 U. S. 279, 295, 296, 24 S. Ct. 719, 48 L. Ed. 979; Kansas v. Colorado (1906) 206 U. S. 46, 89, 90, 27 S. Ct. 655, 51 L. Ed. 956.

The power to regulate the conduct of individuals for what is assumed to be the benefit of the general mass being to some extent the very purpose of association in government, it is certainly implicit in whatever authority is set up. It follows that this power, known as the "police power," and described by Justice Holmes as "the general power of the Legislature to make a part of the community uncomfortable by a change" (Tyson v. Banton [1927] 273 U. S. 418, at page 447,

47 S. Ct. 426, 433, 71 L. Ed. 718, 58 A. L. R. 1236), was lodged in the thirteen states at the time of the adoption of the Constitution. The reservation of the Tenth Amendment must accordingly run to them.

We must reject, therefore, counsel's argument, based on their combination and subsequent interpretation of article 5 and the Tenth Amendment. We give, however, full weight to their development of the tacit assumptions drawn from both the historical and theoretical nature of our federal system, although our development thereof does not altogether parallel that of their briefs.

·The statements of publicists, and even of judges, reveal some confusion of thought on the subject of local self-government in a federal as distinguished from an unitary state. They seem to assume that the problem is peculiar to the former style of government; whereas, it is, of course, implicit and variously solved in all 'government. In a federal state, however, its solution is achieved according to the nature of that state, by the rigid distribution of power between the subsidiary or local and central or federal authority. Any particular distribution is, of course, vitally affected by the theory and practice existing at the time of its origin or change. The writings (Federalist, Nos. 18, 19, and 20) and the speeches, both in and out of the convention, of those engaged in framing the Constitution, make it abundantly clear that the historical examples of attempted integration of separate communities with which they were familiar were the Greek leagues, the Swiss cantons, the Seven United Provinces of the Netherlands, and the German Bund. Freeman, in his History of Federal Government from the Foundation of the Achaian League to the Disruption of the United States (1863), (it is library tradition that the result of the Civil War so disappointed the learned author that his opus stopped at volume 1), subdivides federal commonwealths into two classes. They are, first, the system of confederated states where the central power deals with the state governments only; and, second, the composite state, where the central power acts directly on all citizens. It is doubtful whether this classification would meet with the approval of later writers on political science whom we have quoted heretofore. Nevertheless, it is plain that of the examples mentioned only the Achaian League came anywhere near fulfilling the latter condition. Freeman, p. 12; J. S. Mill, Representative Government, p. 301; Motley, The Rise of the Dutch Republic, vol. 3, p. 415.

For, although Polybios shows that every Achaian citizen stood in a direct relation to the federal authority and was in a strict sense a citizen of the league itself and not merely of the cities which composed it (Polybios, vol. 2, p. 37), we do not seem to know whether the federal taxes were gathered by federal tax collectors or merely requisitions apportioned by the cities themselves. Volume 4, p. 60. Freeman seriously questions the scholarship of the Framers and points out that the chief source of their knowledge of the Greek Leagues was Abbe Mably, whose historical accuracy he seriously discredits. Freeman, p. 319. At any rate, they had before them only one precedent, and that a somewhat uncertain one, of a state with a central power acting directly on its citizens. The pre-existing theory, then, favored a confederate state and was opposed to a composite one, in which alone there was, of course, any power to distribute.

The practice of local autonomy in the Colonies and their struggle for its maintenance, both before and during the Revolution, is so much and so well-known a part of their history that any extended citation of authority here would seem to be pedantic. Professor Dunning, in his History of Political Theories, above cited, discusses the development of the religious movement of "Independency," or "Brownism," as it is called, in England, together with its political implications, and its final outcome in the Separatist Movement and in the settlement of New England. Dunning, vol. 3, p. 231. The most learned and detailed exposition of the colonial institutions is found in the four volumes of Professor H. L. Osgood's "The American Colonies in the 17th Century," wherein the learned author discusses the particular institutions of the individual Colonies and emphasizes the church community, the town, the county, and the parish. Although the degree of self-government varied somewhat between the corporate colonies and the proprietary provinces, Professor Osgood summarized the matter thus:

"All writers who have discussed the early history of the British-American colonies have dwelt with greater or less emphasis on the degree of self-government which they enjoyed. In the preceding chapters an effort has been made to show in some detail in what that self-government consisted and under what forms it appeared. The degree to which it was actually enjoyed is indicated by the fact that it has been possible to describe thus fully the internal organization of the char-

tered colonies, and to follow the development of their policy, with only an occasional reference to king or parliament." Volume II, p. 436.

The part played by local self-government in the struggle for independence by the Colonies has been the subject of vast historical comment. Professor Corwin, in an article entitled "The Higher Law Background of the Constitution," 42 Harv. Law Rev. 149 and 365, has thus cogently epitomized the matter:

"At the same time it is necessary to recognize that the American Revolution was also a contest for local autonomy as well as one for individual liberty. The two motives were in fact less competitive than complementary. The logical deduction from the course of political history in the colonies, especially in the later decades of it, was that the best protection of the rights of the individual was to be found in the maintenance of the hard-won prerogatives of the colonial legislatures against the royal governors; in other words, of what they locally termed their 'Constitutions.' The final form of the American argument against British pretensions was, therefore, by no means a happy idea suggested by the stress of contention, but was soundly based on autochthonous institutional developments." Pages 401, 402.

See also Jefferson's Summary Views, 11 Jefferson's Writings, 258; Political Ideas of the American Revolution (1922), Adams, chapters 3 and 5; McIlwaine, The American Revolution.

These ideas found such frequent expression in the Federalist and in the Debates at the principal and ratifying conventions that we are preparing a separate memorandum in which the language containing them is set forth. Most of those who spoke expressed a whole-hearted dread of "consolidation," as they called it, and exhibited a firm determination to concede as little of the power of the individual states as was consistent with the breakdown in the previous Confederation, which had forced the calling of the convention and some change in the existing conditions of government. As typical, we are including here a quotation from the Federalist, in No. 17, two references each in the federal and ratifying conventions, and two from the most famous of the opinions of Chief Justice Marshall:

"The regulation of the mere domestic police of a state, appears to me to hold out slender allurements to ambition. Commerce,

finance, negotiation, and war, seem to comprehend all the objects which have charms for minds governed by that passion; and all the powers necessary to those objects, ought, in the first instance, to be lodged in the national depository. The administration of private justice between the citizens of the same state; the supervision of agriculture, and of other concerns of a similar nature; all those things, in short, which are proper to be provided for by local legislation, can never be desirable cares of a general jurisdiction." Lodge's Ed., The Federalist, p. 98.

Mr. Rutledge, of South Carolina, from the Committee on Detail, reported:

"At the end of the sixteenth clause, of the second section, seventh article, add, 'and to provide, as may become necessary, from time to time, for the well managing and securing the common property and general interests and welfare of the United States in such manner as shall not interfere with the government of individual States, in matters which respect only their internal police, or for which their individual authority may be competent.'" Madison's Journal, p. 585.

And Mr. Sherman, of Connecticut:

"Thought it reasonable that the proviso in favor of the States importing slaves should be extended, so as to provide that no State should be affected in its internal police, or deprived of its equality in the Senate." Journal, p. 737. And see his remarks to the same effect on page 361. He then put the motion (page 738), which was lost by a vote of eight to three, New Jersey, however, voting in favor of the motion.

It is perhaps not generally realized that a suggestion that Congress be given power to enact sumptuary laws was made at the federal convention; Oliver Ellsworth, of Connecticut, afterwards Chief Justice, saying with respect thereto that "as far as the regulation of eating and drinking can be reasonable, it is provided for in the power of taxation," Journal, p. 562; and Gerry, of Massachusetts, adding "the law of necessity is the best sumptuary law." The motion was lost by a vote of eight to three.

The same sentiments are portrayed in the ratifying Conventions. So, James Monroe, in the Virginia Convention:

"What are the powers which the federal government ought to have? I will draw the line between the powers necessary to be given to the federal, and those which ought to be left to the state governments. To the former I would give control over the national affairs; to the latter I would leave the care of local interests." Elliot's Debates, vol. 3, p. 214.

And to the same effect, Colonel Varnum in Massachusetts:

"After stating the difference between delegated power and the grant of all power, except in certain cases, the colonel proceeded to controvert the idea that this Constitution went to a consolidation of the Union. He said it was only a consolidation of strength, and that it was apparent Congress had no right to alter the internal relations of a state." Elliot, vol. 2, p. 78.

Finally, let us hear Chief Justice Marshall, speaking in the famous case of McCulloch v. Maryland (1819) 4 Wheat. 316, at pages 403 and 431, 4 L. Ed. 579:

"No political dreamer was ever wild enough to think of breaking down the lines which separate the States, and of compounding the American people into one common mass. * * *

"Would the people of any one State trust those of another with a power to control the most insignificant operations of their State government? We know they would not."

The nuances of political theorists with respect to the doctrine of popular sovereignty are difficult to follow. To what extent the Constitution finally reflects them is also in dispute. We think that Walter Lippman correctly appraises the situation. He says, in Public Opinion (1921), p. 283:

"But though popular sovereignty was not clearly understood by anybody, it seemed to imply so great an enhancement of human life, that no constitution could stand which frankly denied it. The frank denials were therefore expunged from consciousness, and the document, which is on its face an honest example of limited constitutional democracy, was talked and thought about as an instrument for direct popular rule."

And see, Lecky, Democracy and Liberty, vol. 1, p. 55; Myer's History of the Supreme Court, c. 3, "Real Forces of the Revolution."

This "talking and thinking" had an ample reservoir to draw from in the writings of those who were participating, with their pens at least, in the attempts to resist the oppressions of the Stuarts and the Bourbons. As a matter of fact, the idea of popular sovereignty and of a contract between governors and governed were outlined in Cicero's De Republica, Book 1, pp. 25, 26, 32, and Book

3, p. 13, and in Sir John Fortescue's De Laudibus Legem Angliae, pp. 9, 13, 14, and 18. The much more classical education of those days made the framers familiar with both such works.

The contact of the colonists with the events in the mother country preceding establishment of the Protectorate (Macaulay, History of England, vol. 1, pp. 113 to 155) was naturally particularly close, and it is not surprising to find them thoroughly conversant with the political literature of that period, including the pamphlets of Colonel Lilburne, above mentioned, of the Levellers, and the more sober Milton, Harrington, Sydney, and Locke. As Professor Dunning says, most of the catchwords of modern democracy are to be found in the pamphlets of the first named, e. g. "We, the people" (of the Preamble of the Constitution) in his "Vox plebis." So, in Milton's Tenure of Kings and Magistrates (1649), in Harrington's The Commonwealth of Oceania (1656) (This work embodied a scheme for a Constitution of Great Britain to be instituted by Cromwell), and Algernon Sydney's Discourses concerning Government (1688), repeated references to the authority of the people appear. It is in Locke's Treatise on Civil Government (1690) that this doctrine finds most complete expression, and it is with Locke's work that the framers were most familiar and to which they made most frequent reference. So, we find in the Treatises, Book 2, § 149, the following: "The community perpetually retains a supreme power of saving themselves from the attempts and designs of anybody, even of their legislators, whenever they shall be so foolish or so wicked as to lay and carry on designs against the liberties and properties of the subject." (Montesquieu, another favorite of the framers, manifested no interest in the idea of popular sovereignty, but devoted most of L'Esprit D'Lois to the theory of the separation of powers.) We have not overlooked, of course, Rousseau, and his American prototype, Thomas Paine. The former's doctrines indirectly affected the writings of the Englishmen we have referred to. The latter's violent hatred of monarchy, as evinced in his Common Sense, contributed to the general exaltation of the people.

The references to the people in the Convention Debates and in the early Supreme Court opinions are so numerous that here again we have prepared a separate memorandum setting them forth. Practice undoubtedly lagged behind profession. The extent of this difference between ideal and reality varied in the different colonies and early states, and is discussed in more detail than we can afford it in Professor Osborne's book above cited. And see also McKinley, The Suffrage Franchise in the Thirteen English Colonies, and Bishop's History of Elections in the American Colonies.

The court was somewhat surprised to find that counsel were advocating the convention method of ratification and yet had not referred it to the four books which have been written on the use of the convention in formulating and amending Constitutions. They are, in order of publication: Jameson, Constitutional Conventions; Dodd, Revision and Amendment of State Constitutions; Borgeaud, Adoption and Amendment of Constitutions; and Hoar, Constitutional Conventions. (And see also an article by A. Caperton Braxton in 7 Virginia Law Register and the chapters on "Constitutions" and "Amending the Organic Law" in Congressman Luce's Legislative Principles, pages 123 and 144.) An examination of these works indicates the importance of the convention in the transition from colonial status to that of sovereignty of statehood.

Judge Jameson traces the development of the convention from the revolutionary one, such as those occurring in England in 1660 and 1689 (Macaulay, vol. 1, ch. 1) (the latter being the convention which called William and Mary to the throne of England and embodied the Declaration or Bill of Rights in the Act of Settlement) (Macaulay, vol. 3, pp. 338, 349, 360, and 400) through the conventions in the several colonies, whereby they assumed the position of independent sovereignties (Kamper v. Hawkins [1793] 1 Va. Cas. [3 Va.] 20, 68), to the constitutional convention as we know it to-day. He says:

"The history of that institution may be summed up in a few words; it is an adaptation to the exigencies of constitutional life and government, in the United States, of the Revolutionary Convention, as derived from our English ancestors of 1660 and 1689.
* * *

"But as the worst oppressions, experienced by them as colonies, had been at the hands of parliament,—a popular assembly, in theory, if not in fact, representing the Commons of the whole Empire,—might not their own assemblies in time become their oppressors, especially if allowed to retain not only the power of ordinary legislation,

but that transcendent one exercised by the English Parliament, of framing the organic law?

"This apprehension, nearly universal at the time of our separation, led the statesmen of the Revolution to seek some other depositary of the latter power. This they found in Conventions, called by the Governments in force in the several colonies, modelled, in point of structure and organization, after the Revolutionary Conventions, with which they were so familiar, but charged with the single function of maturing the charters, or Constitutions, rendered necessary by the altered condition of their affairs."

Jameson, The Constitutional Convention, pp. 12 and 13.

The de facto governments of the revolting Colonies brought about the establishment of written Constitutions, in the majority of instances by a method tantamount at least to a convention. In nine of these cases the action was taken by the legislative body, it is true, but by a legislative body which was expressly authorized thereto by the people. Hoar, p. 4; Dodd, pp. 1 to 15. Thus, the North Carolina provincial Congress on August 9, 1776, resolved:

"That it will be the business of the Delegates then chosen not only to make Laws for the good Government of, but also to form a Constitution for this State, that this last as it is the Corner Stone of all Law, so it ought to be fixed and permanent." No. Car. Colonial Records, 498, 579.

And the president of a similar body in Georgia enjoined upon the people "the necessity of making choice of upright and good men to represent them in the ensuing convention—men whose actions had proved their friendship to the cause of freedom, and whose depth of political judgment qualified them to frame a constitution for the future government of the country." Stevens, History of Georgia, II, 297.

In New Hampshire and Massachusetts, Constitutions were drafted by an independent body chosen for that sole purpose. Hoar, pp. 6 to 8; Dodd, pp. 4 to 10; Luce, pp. 137 and 139. In New Hampshire, the united committees of the towns of the New Hampshire grants insisted that the further establishing a permanent plan of government in the state be submitted to an assembly that shall be convened for that purpose only. New Hampshire Town Papers, vol. 13, p. 763. So, in Massachusetts, the first constitution was rejected because it had not been framed by a body chosen for that one purpose. Cushing, Transition from Provincial to Commonwealth Government, p. 190. We have already seen that of the eight Constitutions which did provide for amendment prior to 1787, five required that the process be undertaken in some form of convention. Dodd, p. 8. We can safely conclude with Professor Dunning, therefore, that:

"In the primary group, however, the particular commonwealth, the Americans manifested in one respect a very great clarity of democratic analysis. The framing of their constitutions they insisted should be the particular function of a special organ, distinct from the government and immediately representative of the people. Thus the constitutional convention came into the field of law and of philosophy." Dunning, p. 98.

This discussion of the assumptions underlying the amending clause of the Constitution has been as thorough as the inhibitions of our scholarship and the amount of space that can be allotted thereto, even in an opinion on a subject of such fundamental importance, permit. It seems indisputable that local self-government, popular sovereignty, and the convention system of drafting and amending Constitutions were the very "warp and woof" of the political thought of the whole period prior to the drafting and adoption of the federal Constitution. The thought processes of President Lincoln have come to typify so much the spirit of our institutions that it may not be inappropriate to conclude this phase of the subject with a quotation from his first inaugural address:

"I will venture to add that to me the convention mode seems preferable, in that it allows amendments to originate with the people themselves, instead of only permitting them to take or reject propositions originated by others, not especially chosen for the purpose, and which might not be precisely such as they would wish to either accept or refuse. I understand a proposed amendment to the Constitution—which amendment, however, I have not seen—has passed Congress, to the effect that the Federal Government shall never interfere with the domestic institutions of the States, including that of persons held to service. To avoid misconstruction of what I have said, I depart from my purpose not to speak of particular amendments so far as to say that, holding such a provision to now be implied constitutional law, I have no objection to its being made express and irrevocable." Richardson, Messages and Papers of the Presidents (1789–1897), Vol. VI, p. 10.

It is only fair to point out that in the first part of the above-quoted passage Mr. Lincoln was discussing the proposal of amendments and not their ratification. His argument applies, a fortiori, however, to the latter process.

We have tried in the preceding pages to do justice to what we have called the stereotyped method of constitutional interpretation. In spite of our conscientious efforts, we cannot help a feeling of impatience at its unreality. We prefer to regard our frame of government as a problem in political science, to be solved as far as may be, according to scientific principles. The qualification "as far as may be" must be included because a written document imposes certain limitations upon any approach, scientific or otherwise. We quite agree with Professor Beard in his statement that "a search for 'the will of the people who made the Constitution' leads into a Serbonian bog." The American Leviathan; The Republic in the Machine Age, p. 27.

We are encouraged to find that this same impatience appears also in the writings of those whose study of the Constitution has been infinitely more thorough and able than our own. So Professor Burgess, in his Political Science and Constitutional Law:

"There is a growing feeling among our jurists and publicists that, in the interpretation of the constitution, we are not to be strictly held by the intentions of the framers, expecially since the whole fabric of our state has been so changed by the results of rebellion and civil war. They are beginning to feel, and rightly too, that present conditions, relations, and requirements, should be the chief consideration, and that when the language of the constitution will bear it, these should determine the interpretation." Volume 1, pp. 153, 154.

And Viscount Bryce, in his Studies in History and Jurisprudence:

"To this the Australians replied that the experience of the United States had shown that in constitutional questions it was sometimes right and necessary to have regard to the actual conditions and needs of the nation; that constitutional questions were in so far political that where legal considerations were nearly balanced, the view ought to be preferred which an enlightened regard for the welfare of the nation suggested." Volume I, pp. 510, 511.

And, finally, our own Justice Holmes:

" * * * When we are dealing with words that also are a constituent act, like the Constitution of the United States, we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters. It was enough for them to realize or to hope that they had created an organism; it has taken a century and has cost their successors much sweat and blood to prove that they created a nation. The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago." Missouri v. Holland (1920) 252 U. S. 416, 433, 40 S. Ct. 382, 383, 64 L. Ed. 641, 11 A. L. R. 984. Here again we are preparing a memorandum of the cases in the United States Supreme Court in which we think a decision rested upon the principles of political science. A notable example is found in the so-called Insular Cases, 182 U. S. 1, 244, 21 S. Ct. 743, 827, 45 L. Ed. 1041, 1086; Warren, vol. III, p. 430.

Political science can give only one answer to the question presented by the alternative methods of ratification prescribed by article 5. If the amendment to be considered is one designed to transfer to the United States powers heretofore reserved to the states, or, if there are any such, to the people, that answer must be in favor of the convention method. This follows from the character of such amendments and from the character of the delegates to and deliberations in a constitutional convention, as compared with the corresponding character of the personnel of state Legislatures and their deliberations. We hope that the fundamental nature of a transfer of additional power to the federal government has been made sufficiently plain by the previous exposition of our federal system, with its shibboleths of local self-government and popular soveregnty.

We believe that much historical evidence could have been submitted touching the circumstances of the ratification of the various amendments to the Constitution. We can recall James Ford Rhodes' account of the ratification of the Fourteenth and Fifteenth Amendments, the re-entry into the Union of the seceding states being conditional upon such action on their part. Rhodes, History of the United States (1850–77), p. 3 et seq., p. 31 et seq. For a more minute account of the same happening, see Claude G. Bowers' The Tragic Era. Ida Husted Harper's monumental History of Women's Suffrage gives, in volume 6 a detailed account of the ratification of the Nineteenth Amendment by the Tennessee Legislature. This resulted, in the

last analysis, upon the change in the vote of a youthful legislator of that state, who very sensibly declared that he had always been in the habit of following the advice of his mother. One of the articles appended to the Senate Hearings on the Wadsworth-Garret suggested amendment to the Constitution, of which more hereafter, relates that a certain state Legislature ratified the Eighteenth Amendment in fifteen minutes. Assn. of the Bar of the City of New York Pamphlets' (1923) vol. 386.

Such evidence might have been accumulated. In its absence, however, we believe we are entitled to consider the opinions of experts on government, especially perhaps as their conclusions on this subject would seem to be fairly obvious. If we proceed on the trusteeship theory of representation, the quality of the individuals in the ratifying body is important, since they are acting without instructions. Edmund Burke's famous Letter to the Sheriffs of Bristol; Bryce, Modern Democracies, vol. 2, p. 384. It is possible to obtain as delegates to a constitutional convention a higher grade of men than on the average fill the halls of our state Legislatures. The reasons for the decline in the latter bodies are fully discussed by President Lowell, of Harvard University, in chapter 10 of his book, Public Opinion and Popular Government, the subheadings of which include "Pressure of Local and Private Interests" and "The Lobby." Pages 133–135. Congressman Luce devotes chapter 14 of his book on Legislative Assemblies to the same sad subject. At page 309 the learned author includes a passage from Confucius which is so apt that we are repeating it:

"How can a man serve the prince? When out of office, his sole object is to attain it; and when he has attained it, his only anxiety is to keep it. In his unprincipled dread of losing his place he will readily go all lengths."

Manifestly, none of these influences affect the delegate to a constitutional convention and he can be disturbed by no hope of political gain or fear of political punishment. If, on the other hand, we adopt the conduit pipe or mandat imperatif theory of representation (a view which seems to be rather more prevalent in this country), the object of the mandate must be presented to the voters before and not after their selection of delegates whom they intend to instruct. This is impossible, naturally, in the case of legislators elected prior to the submission of the particular amendment.

We are submitting the testimony of two experts in government each one from separate periods of our history. As the considerations we have just outlined are naturally commingled, we have not attempted to divide them.

"Though this mode, under proper restrictions and in cases to which it is adapted, may be followed without danger, yet it is subject to obvious objections. The legislature is a body chosen for temporary purposes. It is a mirror of political passions and interests, and, with the best intentions, cannot be expected to be free from bias, even in questions of the highest moment. It is composed, moreover, in general, of politicians rather than of statesmen. Indeed, if a man shows himself, by culture and the breadth of his views, to be fitted for the highest trusts, it is nearly certain that he will not be found in the legislature, but be left in obscurity at home. But, when a Convention is called, it is sometimes possible to secure the return of such men. It is not necessarily because such a body is recognized to be, as it is, the most important ever assembled in a State, but because the measures it is expected to mature bear less directly on the interests of parties or of individuals. Party management, therefore, is not usually so much directed to the seeking of control of a Convention as of a legislature. Besides, the proper function of the latter body, that of municipal legislation, being one of the highest vested by the sovereign in any governmental agency, it cannot but be inexpedient, on a general view, that there should be added to it that of organic legislation, requiring different and higher gifts, and wider experience and study, thus threatening to unsettle the balance of the Constitution." Jameson, The Constitutional Convention, pp. 194, 195 (1867).

"Another and perhaps more vital objection to the existing amendment process is that ratification can be effected by a relatively small number of persons who happen to be in the State legislatures at the time a proposition is submitted. In all there are about seventy-five hundred members in the forty-eight bodies combined. If we group the thirty-six states with the smallest assemblies together we find that approximately two thousand members properly divided between the upper and lower houses can carry or defeat a resolution of amendment laid before them by Congress.

"The number of persons taking part in the ratifying operation is not as significant

as the fact that they are only incidentally concerned in it as legislators. They are elected for other purposes. Their main duty is to make laws for the states. Often they are chosen previous to the passage of a proposed amendment by Congress, and are thus asked to decide a matter which was not even before the public when they were candidates. Moreover the type of man found in the legislature is usually not as high as that generally elected to state constitutional conventions. Many people of great ability are willing to serve in a convention for a short period, who would not think of spending any time in the business of ordinary legislation. It is, therefore, not merely the political arithmetic of the amending system which invites criticism. It is to be criticized because it is casual in its nature and does not provide for that special and searching consideration which a change in the supreme law of the land deserves." Beard, The American Leviathan, the Republic in the Machine Age, p. 43 (1930).

Because of these factors of mechanical efficiency pertaining to a convention system of deliberation, political science also takes cognizance of what might be called, in these Freudian days, a psychological element. It is scarcely necessary to argue in favor of the duty and the expediency of watching closely the currents of public opinion before undertaking changes in government. Lecky, Democracy and Liberty, vol. 2, p. 99. Public Opinion, in its relation to law, is thus described in Lieber's Manual of Political Ethics:

"Public opinion is not only an opinion pronounced upon some subject, but it is likewise that which daily and hourly interprets laws, carries them along or stops their operation, which makes it possible to have any written laws, and without which the wisest law might be made to mean nonsense. It is that which makes it possible to prescribe and observe forms without their becoming a daily hindrance of the most necessary procedures and actions; it is that mighty power which abrogates the most positive laws and gives vast extent to the apparently narrow limits of others; according to which a monarch ever so absolute in theory cannot do a thousand things; which renders innocent what was most obnoxious, and at times makes useless the best intentioned measures, protecting sometimes even crime." (2d Ed.) I, p. 223. And so George Washington, in a message to Congress dated October 25, 1791, speaking of an internal revenue statute of those days,

said: "It is necessary to lay the foundation of the public administration in the affections of the people." Richardson, Messages and Papers of the Presidents (1789–1897) vol. VI, p. 10.

A convention, either because of directly instructed or abler delegates, is, as we have seen, a better vehicle for the expression of public opinion than a state Legislature. Its ultimate acts will because of this fact command greater popular support and will not be faced to such an extent with the problem summed up in Professor McBain's chapter heading, "The Divine Right of Fifty-One Percent." Prohibition, Legal and Illegal, above cited. Counsel, in their reasoning based on the reservation to the people in the Tenth Amendment, are confusing the people as represented by a convention or a state Legislature with public opinion as reflected in the two agencies.

The views of political science above expressed seem to have influenced the law givers of certain of these states. Thus, we find in the Constitution of Missouri of 1875, article 2, § 3, providing as follows:

"The Legislature is not authorized to adopt, nor will the people of this State ever assent to, any amendment or change of the Constitution of the United States which may in any wise impair the right of local self-government belonging to the people of this State;"

And in the Constitutions of Florida (1885, art. 16, § 19) and Tennessee (1870, art. 2, § 32) provisions to the effect that:

"No convention nor Legislature of this State shall act upon any amendment of the Constitution of the United States, * * * unless such Convention or Legislature shall have been elected after such amendment is submitted."

See also the article above cited in the Virginia Law Review with respect to a proposed addition to the Constitution of Virginia of similar tenor. 14 Va. Law Rev. p. 191. Finally, Senator Wadsworth and Representative Garrett introduced a proviso to article 5 of the Constitution, which reads as follows:

"Provided, That the members of at least one house in each of the legislatures which may ratify shall be elected after such amendments have been proposed; that any state may require that ratification by its legislature be subject to confirmation by popular vote; and that, until three-fourths of the states have ratified or more than one-fourth of the

states have rejected or defeated a proposed amendment, any state may change its vote." S. J. Res. 40, 67th Cong., 4th Sess.

In commenting on this proposed amendment, Professor Miller, of the University of Minnesota Law School, says, and incidentally supports our view of the effect which should be given to the decision of the United States Supreme Court in Leser v. Garnett, above cited:

"A persuasive argument can be made in favor of each of the three limitations. If each state were required to elect at least one house of its legislature before it could ratify, then the issue of ratification or rejection could be presented to the people of the state and a vote of instruction given to the representatives elected. Stated in more practical terms, each legislative candidate could be forced to declare himself to be for or against ratification and his declaration could be made the basis of his own election or defeat. As a matter of fact, it has been urged by counsel before the United States Supreme Court that this limitation already exists in some of the states by virtue of laws existing therein. The Supreme Court, however, rejected the contention in its opinion in the case of Leser v. Garnett and denied the power of a state to determine the method of ratification of an amendment of the federal Constitution." 60 Am. Law Rev. page 183.

We are quite willing to stand flat-footedly on our thesis that the scientific approach to this problem of government requires an approval and ratification of certain amendments by and in a convention, and that the language of article 5 can be taken as modified by the principles of political science before stated. For the doubting, however, we are prepared to call to our assistance two more purely legalistic doctrines. One of them was evolved by Judge Jameson with respect to the proposal of amendments. (It applies, a fortiori, and with even greater force to their ratification.) We state it as repeated and amplified by Professor Dodd:

"Judge Jameson has said as to the legislative method of proposing amendments: 'It ought to be confined, it is believed, to changes which are few, simple, independent, and of comparatively small importance. For a general revision of a Constitution, or even for single propositions involving radical changes as to the policy of which the popular mind has not been informed by prior discussion, the employment of this mode is impracticable, **or** of doubtful expediency.'

With reference to this latter point, it may be argued, however, that if a constitution specifically provides two methods of alteration, the language employed with reference to the proposal of amendments by the legislative method may, when read with that concerning the convention method, often be construed as an implied prohibition of complete constitutional revision by the legislative method. Leaving aside the constitutional question, it would seem clearly preferable that when possible complete revisions or even alterations of a very thorough character should be made by conventions expressly chosen for that purpose. Legislatures will usually have their time taken up with other matters and be unable to devote sufficient time to this subject, and the election of a body for the one purpose concentrates public attention upon questions of a constitutional character. The convention will ordinarily be able to do better work than the legislature because its attention will be confined to the one task of framing a constitution. Moreover, it has as a rule been possible to obtain for membership in conventions a higher grade of men than may usually be found in the ordinary legislative bodies, and this constitutes a practical reason of very great importance for not weakening the functions of conventions." Dodd, The Revision and Amendment of State Constitutions, pp. 261, 262.

The second follows from the nature of the congressional act of proposal. Only one writer that we have found has attempted any distinction between the functions of Congress in fixing the content of an amendment and in proposing the same for approval. Burgess, Political Science and Constitutional Law, p. 148.

In the case of Hollingsworth v. Virginia, above cited, counsel for the state of Virginia contended that the Eleventh Amendment had not been properly adopted, because it had never been submitted to the president for his approval, as required by article 1, § 7, of the Constitution. The United States Supreme Court, in a six-line opinion, declared the amendment adopted, and thereby decided that the action of Congress in formulating and proposing amendments to the Constitution was not legislative. Whatever one may think of the logic of this decision with respect to the content of an Amendment, the Supreme Court's estimation of the nature of the single act of submission to one or another body must be correct. At any rate, since Congress is not acting in a legislative capacity, it follows, we think, that the nature of its func-

tion is administrative. That being so, it falls within the ordinary principles which govern the judicial review of administrative action. A writer of an article under that title in 35 Harvard Law Review says:

"Somewhere in the discretionary power given to an administrative official there must be a standard to govern his action. If this standard is not expressly stated in the statute under which the official acts, it must be determined from its purpose, that is, the general object it is seeking to accomplish and the circumstance which called it forth." Pages 127, 135.

The purpose of the amending clause, as we have tried to develop it in this opinion, would be violated by the submission of amendments transferring powers from the states to the United States, and such submission would therefore constitute an abuse of discretion on the part of Congress in its capacity as an administrative agent.

Only the ratification of the Eighteenth Amendment is before the court for adjudication. Any comment on the method employed in the adoption of the other eighteen would be another example of that habit of passing upon matters not before the court in which the judiciary so often indulges. In one aspect these amendments may, however, be pertinent, e. g., from the point of view of practical or contemporary construction. At the commencement of this opinion we expressed some doubt as to the value of the doctrine of stare decisis. We have somewhat the same feeling with respect to the kindred principle above mentioned. We think the latter also amounts to saying, "What is good is old." We do not think that the legislative ratification of the other amendments of the Constitution need trouble even those who do not agree with us on this point.

The Twelfth and Seventeenth Amendments affected the machinery of government by varying the method of election of the President and of United States Senators. The Eleventh and Sixteenth Amendments made certain changes in the judicial and taxing powers of the federal government, and in so doing corrected previous decisions of the United States Supreme Court. The Ninth and Tenth Amendments were concerned, as we have seen, with the reservation of rights and powers. The first eight Amendments and the Fourteenth, Fifteenth, and Nineteenth Amendments contained limitations upon the power of the United States or of the states. The Thirteenth Amendment, in our opinion, presents certain points of resemblance to the Eighteenth Amendment. We believe it is distinguishable, however, because it strikes down in terms the enslavement of human beings and operates directly upon the property laws of any states permitting that institution. It does not, as does the Eighteenth Amendment, contain a grant of power to regulate and prohibit certain acts. If we are wrong in this view, an examination of the Constitution and laws of the forty-eight states shows, as might be expected, that the question is in this day and generation an academic one.

Our people reluctantly delegated to the United States certain powers of government, whose exercise they had jealously guarded and previously permitted to the states alone. They also provided for two forms of approving any changes in the frame of government they had set up. The compulsory use of the heretofore untried method of approving or ratifying in conventions the transfer of additional powers from the states to the United States is consistent with both the history of our institutions and the principles of political science. Only a more perfect realization of this fact will permit our country to be "truthfully organized," as that expressive phrase is used in Professor Burgess' preamble to his book on Political Science and Constitutional Law. He says:

"A complete constitution may be said to consist of three fundamental parts. The first is the organization of the state for the accomplishment of future changes in the constitution. This is usually called the amending clause, and the power which it describes and regulates is called the amending power. This is the most important part of a constitution. Upon its existence and truthfulness, i. e., its correspondence with real and natural conditions, depends the question as to whether the state shall develop with peaceable continuity or shall suffer alternations of stagnation, retrogression, and revolution. A constitution, which may be imperfect and erroneous in its other parts, can be easily supplemented and corrected, if only the state be truthfully organized in the constitution; but if this be not accomplished, error will accumulate until nothing short of revolution can save the life of the state." Page 138, vol. 1.

It will be observed that in the course of this opinion there has been no mention of the specific subject-matter of the Eighteenth Amendment, such specific subject-matter not being germane to the broad principles both counsel and the court have endeavored to lay down. In pondering the questions involved,

we have wondered why the Eighteenth Amendment has not been tested in relation to the "due process clause" of the Fifth Amendment. We should think that such a test might be based on the following reasoning: The Eighteenth Amendment does not and could not, unless it expressly so declared, abrogate the due process clause of the Fifth Amendment. Any action thereunder must be regarded in the light of what is reasonable. Baltimore & O. R. Co. v. Interstate Commerce Commission (1911) 221 U. S. 612, 31 S. Ct. 621, 55 L. Ed. 878. The more advanced school of constitutional thinkers consider this "reasonableness" from the point of view of the efficacy of the remedy prescribed for any particular evil. Frankfurter, Realism in Constitutional Law.

Thus, in two cases in the United States Supreme Court vaccination and sterilization have been found to be efficacious in preventing the spread of smallpox and idiocy, and have therefore been sustained against attack under the due process clause of the Fourteenth Amendment (applicable to the states). Jacobson v. Massachusetts (1905) 197 U. S. 11, 25 S. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765; Buck v. Bell (1927) 274 U. S. 200, 47 S. Ct. 584, 71 L. Ed. 1000.

Equally, we think, the efficacy of the Eighteenth Amendment and its' enforcing legislation in preventing the spread of intemperance should be the criterion in deciding upon its validity under the due process clause of the Fifth Amendment applicable to the United States. We see no difference between improving the health and/or morals of people by the application of serum or the knife and improving their health and/or morals by closing their mouths to drink. To determine its efficacy we willingly admit is a task in comparison to which the activities of Hercules in the Aegean stables are child's play. We do not believe it can be done except by the method of testimony offered in open court, with cross-examination, stenographic records, and the other safeguards of judicial procedure. It manifestly cannot be done on the hustings or in the market place in the atmosphere of personal abuse therein engendered. We do not consider, either, that it can be done in the halls of legislative bodies or in the chambers of executive commissions, both of which proceedings are subject to political criticism and whose witnesses are bound to be the result of a more or less arbitrary selection.

We hope, therefore, that this question will be presented to some court some day. When it is, we humbly suggest that all concerned prepare themselves for the investigation by carefully reading chapter 7 of volume 2 of Lecky's great book, Democracy and Liberty (1896). They will find therein an unexcelled philosophical and practical discussion of the difficulties inherent in the attempt to legislate on intoxicating drink, as exemplified in the history of all the countries that have made such attempts. Mr. Lecky commences his discussion at page 111 in the following words:

"The most difficult of this class of questions, and among the most difficult in the whole range of practical politics, are those connected with the sale of intoxicating drink. They affect in the highest degree the pleasures, the comforts, the liberty, the morals, and the fortunes of the poor, and they affect, in very different ways, vast material as well as moral interests. Immense sums are invested in public-houses. An immense revenue derived from the sale of intoxicating liquors pours into the coffers of the State; while, on the other hand, the mass of improvidence and ruin, or disorder and crime, or depreciation of property, and of police and prison expenditure, which is clearly traceable to excessive drinking, is so great that many persons would shrink from scarcely any measure, however drastic, to prevent it."

Those interested in bringing their information up to date would do well to read a book originally published by that well-known social worker, Mrs. Rita Childs Dorr, entitled Drink, Coercion or Control.

We hold the adoption of the Eighteenth Amendment to be invalid, and the motion to quash the indictment is accordingly granted.